**UNITED STATES DISTRICT COURT**

**DISTRICT OF SOUTH DAKOTA**

**CENTRAL DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**JAMES RUTLEDGE,**<br><br>**Defendant.** | **3:20-CR-30144-RAL**<br><br>**REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS EVIDENCE** |

In this methamphetamine distribution case, James Rutledge seeks to suppress all evidence obtained during, and as a result of, a search of his vehicle. Because the evidence flowed from a valid traffic enforcement stop and probable cause search of the vehicle, Rutledge's suppression motion should be denied.

## BACKGROUND

In the summer of 2020, officers with the Northern Plains Safe Trails Drug Enforcement Task Force were investigating methamphetamine distribution around Winner, South Dakota. Based on information generated by an informant and obtained from pen register trap and trace (PRTT) warrants of local dealers' phones, officers believed Rutledge was bringing in methamphetamine from Colorado to the Winner area using rental vehicles. As the investigation broadened to include Rutledge, Division

of Criminal Investigation (DCI) Agent Alexa D'Acunto secured a PRTT warrant for phone numbers associated with him.

One of the numbers, initially located in South Dakota, was transferred to another phone in Colorado. Officers monitored the phone and noticed that it began to travel from Colorado to South Dakota during the night and on into the early morning hours of August 27-28, 2020. Tracking data showed the phone was headed north on U.S. Highway 183, a route that would come through Colome, South Dakota. D'Acunto and Task Force officers planned an interdiction stop of the vehicle carrying the phone. Without knowing who was driving the vehicle or what kind it was (aside from an expectation that it was rented), D'Acunto instructed officers to conduct a traffic stop of the vehicle transporting the phone once they developed probable cause to do so.

In Colome, Highway Patrol Trooper Dylan Dowling and BIA Agent Derek Parish watched and waited close to the intersection of U.S. Highways 183 and 18 in an unmarked unit without a dash camera. From their secluded position, they could see the two offset stop signs that an approaching northbound vehicle would encounter. But because of the layout of the intersection, it was less clear from their vantage point whether a vehicle that reached the intersection continued north or west.

The officers waited in the morning darkness. No vehicles came from the south until about 4:50 am, when a white van with Florida license plates approached. The van made a complete stop at the first stop sign, but not the second. Dowling informed other Task Force officers of the traffic violation and reported that the van headed west.

Highway Patrol Sergeant John Lord, who was nearby, responded. Lord headed south on U.S. 183, passing a white van two miles north of the U.S. 183/18 intersection. A short time later, other officers communicated that they were unable to locate a white van west of the intersection on U.S. 18. Lord turned around, located the van that he had just passed, and pulled it over. No other vehicles were in the area.

Lord approached the van, noticed a red mini torch in the center console, and advised the male driver that he had been stopped for failing to stop at a stop sign in Colome. Lord asked the driver for his license and vehicle information. The driver, Rutledge, handed over his South Dakota driver's license and the passenger produced a rental car agreement. Both allegedly displayed signs of nervousness. Rutledge got out of the vehicle and Lord performed a quick pat down before he and Rutledge had a seat in the patrol car. Lord began to write Rutledge a warning ticket for the stop sign violation.

As he did so, Lord asked Rutledge where the two were going. Rutledge replied, "it doesn't matter, just personal issues." Rutledge then briefly spoke with Lord, who inquired about Rutledge's current address. Rutledge said that he was "kind of transitory right now" and that he did not know where he wanted to be, but ultimately provided a mailing address in Boulder, Colorado.

In the midst of updating Rutledge's address and writing the ticket, Trooper Jordan Anderson arrived with his police service dog, Demi. Lord notified Rutledge that while he was not accusing Rutledge of anything, Anderson and Demi would circle the

van because of certain suspicious signs Lord had seen from Rutledge. Rutledge refused to consent to a search of the van.

Ten minutes after the stop and eight minutes after Rutledge entered Lord's car, Anderson deployed Demi. She went around the van once and alerted to the presence of drugs in the rear driver's side corner. Mindful of the alert, Trooper Wes Fischer removed the passenger, Keirsten Wilson, from the van. Fisher talked with Wilson, who gave a false name and date of birth, while Lord finished writing the ticket. Lord exited his car, conferred with Anderson, then returned and detained Rutledge while officers searched the van. Handcuffed, Rutledge commented that he was "tracked up"[1] and that everything in the van belonged to him.

In their search of the van, officers discovered loose methamphetamine, a vape pen, two scales with methamphetamine residue on them, marijuana from a Colorado dispensary, needles, and a safe. An officer brought the safe key, seized before from Rutledge's wallet, back to the scene and opened the safe. Inside, officers found 200 grams of methamphetamine and a 9mm handgun.

Within a day of the search and his arrest, D'Acunto interviewed Rutledge at the Winner City Jail. After she first advised Rutledge of his *Miranda* rights and then questioned him about the methamphetamine in the van and the contents of the safe, Rutledge admitted that he smoked and sold methamphetamine and that the gun was

[1] *See* Mot. Hr'g Tr. 74 (July 22, 2021) ("Q. [W]hat does 'all tracked up' mean? A. Ingestion spots on his veins.").

his. He also talked about his supply sources and distribution of methamphetamine in the Winner vicinity and elsewhere.

Later, a federal grand jury indicted Rutledge on one count of distributing and possessing with intent to distribute 500 grams or more of methamphetamine, one count of possession with intent to distribute 50 grams or more of methamphetamine, and one count of possession of a firearm by a felon. Rutledge now moves to suppress the evidence seized as a result of his traffic stop and statements he made during his post-arrest questioning.[2] The government opposes the motion.[3]

## DISCUSSION

Rutledge attacks the legality of the traffic stop and expansion of it, the scope of the vehicle search, and his interview.[4] The Court addresses each in turn.

### A. The Stop

Rutledge at first claims that Lord lacked probable cause or reasonable suspicion to believe Rutledge committed a traffic offense and therefore had no lawful basis for the stop.[5] Because, he asserts, the initial stop was unconstitutional, all subsequent evidence that officers obtained is the fruit of a poisonous tree and subject to exclusion.

---

[2] Docket No. 29.

[3] Docket No. 36.

[4] Docket No. 30.

[5] *See id.* at 5-7 ("The government in this case cannot show an objectively reasonable suspicion because Lord, the officer who actually seized Rutledge, was

(continued. . .)

The Fourth Amendment protects "[t]he right of the people to be secure ... against unreasonable searches and seizures."[6] The stop of a motor vehicle is a "seizure" of its occupants that must be conducted in accordance with this Amendment.[7] A traffic stop comports with the Amendment if it is supported by probable cause or reasonable suspicion.[8]

Reasonable suspicion arises when an officer "is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion a crime is being committed."[9] Probable cause to conduct a stop exists when an officer observes any minor traffic violation. Any ulterior motive the officer may have for the stop is irrelevant.[10]

The collective knowledge doctrine provides that "probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication."[11] Under this doctrine, an officer

---

aware that the information he received from Dowling was not accurate.").

[6] U.S. CONST amend. IV.

[7] *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012).

[8] *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013).

[9] *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017).

[10] *Garcia v. City of New Hope*, 984 F.3d 655, 664 (8th Cir. 2021).

[11] *United States v. Edwards*, 891 F.3d 708, 711-12 (8th Cir. 2018) (internal quotation

(continued. . .)

on scene may stop a vehicle, when asked to do so, without knowing the factual basis for the stop.[12]

South Dakota law requires that:

> [E]very driver of a vehicle approaching a stop intersection indicated by a stop sign shall come to a full stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection, or if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection[.][13]

Dowling, with over a decade of experience in law enforcement, testified that he observed Rutledge's van come to a complete stop at the first sign, where there is not a clear view of traffic approaching from the west,[14] then roll through the second.[15] Seeing this, Dowling had probable cause to conduct a traffic stop. He relayed to Lord and

---

omitted).

[12] *See United States v. Robinson*, 664 F.3d 701, 703-04 (8th Cir. 2011) (finding reasonable suspicion for an officer to conduct a stop when a detective told dispatch "I need some officers to stop this maroon Cadillac."); *United States v. Jacobsen*, 391 F.3d 904, 907 (8th Cir. 2004) ("The patrol officer himself need not know the specific facts that caused the stop. Rather, the officer need only rely upon an order that is founded on reasonable suspicion. Here, the order was based upon articulable facts supporting reasonable suspicion.").

[13] South Dakota Codified Law (SDCL) § 32-29-2.1.

[14] *See* Mot. Hr'g Ex. 8 at 00:50 (July 22,2021).

[15] *See* Mot. Hr'g Tr. 24 ("As the … van approached the first stop sign that was on the right side of the roadway, it came to a complete stop, proceeded to the – towards the second stop sign, and then failed to come to a complete stop.").

Anderson that a white van failed to stop at the stop sign and proceeded west.[16] While seemingly acknowledging that Dowling had probable cause for the stop, Rutledge maintains that Lord did not because the information Dowling provided, after the stop sign violation, was partially incorrect.

Dowling's mistake about the direction the van traveled after the traffic offense did not vitiate Lord's ability to pull the van over. Reasonable suspicion for a stop requires a "particularized and objective" basis for suspecting criminal activity, and turns on what "the officer reasonably knew at the time."[17] Dowling informed Lord that a white van rolled the stop sign.[18] At roughly five in the morning, no other vehicles, much less other white vans, had passed through the intersection from the south in the preceding hours.[19] When made aware that the white van did not go west, Lord turned around and stopped the same colored van he had earlier passed a short distance north of the intersection.[20] Lord acted in an objectively reasonable manner based Dowling's communique,[21] which provided a sufficient basis for the stop.

---

[16] *See* Mot. Hr'g Tr. 26 ("I relayed [the information] to Trooper Anderson and Sergeant Lord.").

[17] *Hollins*, 685 F.3d at 706.

[18] *See* Mot. Hr'g Tr. 26.

[19] *See* Mot. Hr'g Tr. 24, 27 ("Q. After observing the white van, do you see a vehicle for a while? A. Not that I can recall .... A. It was the only vehicle I think we had seen for maybe three hours.").

[20] *See* Mot. Hr'g Tr. 64 ("Q. At what point did you decide to turn around and

(continued. . .)

**B. Expansion of the Stop**

Rutledge also claims that Lord impermissibly expanded the traffic stop in scope and intensity by talking with him and having a drug dog sniff the van several minutes after the stop. The Fourth Amendment does not permit an extension of a traffic stop without reasonable suspicion of another crime.[22] In Rutledge's case, even if the stop were expanded, reasonable suspicion supported an expansion.

A stop premised only on an observed traffic violation becomes unlawful when drawn out longer than reasonably necessary "to complete the mission" of issuing the ticket.[23] The mission typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," all necessary to help ensure that "vehicles on the road are operating safely and responsibly."[24] During the stop, officers may conduct certain inquiries unrelated to the traffic violation, so long as they do so in

---

follow that vehicle, that must be the van? A. After Trooper Anderson advises that he wasn't coming across the vehicle.").

[21] *See* Mot. Hr'g Tr. 65 ("Q. You're making the stop based on what? A. Based on the information Trooper Dowling gave me.").

[22] *Rodriguez v. United States*, 575 U.S. 348, 355 (2015).

[23] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

[24] *Rodriguez*, 575 U.S. at 355.

a manner that does not prolong the stop.[25] Once the traffic infraction is addressed, or reasonably should have been addressed, the stop and inquiries must terminate.[26]

Lord and Rutledge's conversation did not unreasonably delay the issuance of the warning ticket. Lord briefly asked where the two were going to and coming from as he began filling out on the warning ticket. Then, Rutledge began a conversation,[27] after which Lord tried to verify a valid address for Rutledge. Faced with conflicting documents and Rutledge's statement that he was from Colorado but "kind of transitory right now,"[28] identifying an up-to-date mailing address was a valid part of the ticket issuing mission. Rutledge also posed additional questions to Lord, causing minor delays in finishing up the ticket.[29]

Eight minutes after Rutledge and Lord entered the cruiser, and ten minutes after the stop began, Demi, the service dog, circled the van and alerted.[30] Lord continued to

---

[25] *Id.* ("[t]he critical question … is not whether the dog sniff occurs before or after the officer issues a ticket … but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.'").

[26] *Id.* at 354 (2015).

[27] *See* Mot. H'rg Ex. 1B at 00:08:09-00:09:20.

[28] *See* Mot. H'rg Ex. 1B at 00:10:00-00:10:50 ("So I got a couple different addresses … I'm kinda transitory right now" "Where do you get your mail, what should I use for that?").

[29] *See* Mot. H'rg Ex. 1B at 00:12:18-00:12:30 ("What's the ticket?" "Just a warning." "Those don't cost money?" "No." "Awesome.").

[30] *See* Mot. H'rg Ex. 1A at 00:06:15-00:15:40.

write the ticket while responding to Rutledge's questions and statements about the dog.[31] Given the time required to learn and update Rutledge's address, along with conversation and questions initiated by Rutledge, Lord did not lengthen the stop beyond what was reasonably necessary to complete the ticket issuing process. But even if Lord did extend the stop, Rutledge and Wilson's behavior and statements provided Lord with reasonable suspicion to do so.

Reasonable suspicion, as already discussed, requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a brief investigative stop.[32] Among other things, indirect answers to officer questions, nervousness, lack of eye contact, and inconsistencies "in response to an officer's routine questions about travel plans" are factors that support reasonable suspicion to expand a traffic stop.[33] Lord, in this case, had particularized facts that justified continuing the stop to investigate further.

As Lord approached the van, he saw a red mini torch, commonly associated with drug use, in the center console.[34] Both Rutledge and the passenger, Wilson, displayed

---

31 *See* Mot. H'rg Ex. 1B at 00:15:30-00:17:30.

32 *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021).

33 *Id.*

34 *See* Mot. Hr'g Tr. 67 ("Mostly when I see a torch like that, there's drugs involved.").

signs of being scared and nervous.[35] In response to Lord's question about where they were coming from, Rutledge replied "it doesn't matter, just personal issues."[36] The two gave conflicting stories about where they were going; Rutledge said Chamberlain,[37] Wilson said Lower Brule.[38] Wilson provided a false name and date of birth when asked for her information.[39] Rutledge's demeanor also greatly changed from being visibly tired and nodding off,[40] to being on heightened alert when Lord mentioned Demi's impending deployment.[41] These facts generate reasonable suspicion to extend the stop.[42]

Considering the evidence in its totality, Lord did not prolong the stop. But if Lord did, he had reasonable suspicion to stretch it for as long as he did.

**C. Scope of the Search**

---

[35] *See* Mot. Hr'g Tr. 65 ("They looked scared. They were clearly nervous.").

[36] *See* Mot. H'rg Ex. 1B at 00:07:55 – 00:08:02.

[37] *See* Mot. H'rg Ex. 1B at 00:07:50 ("You were trying to get to Chamberlain you said?" "Yes sir.").

[38] *See* Mot. H'rg Ex. D.

[39] *See* Mot. H'rg Ex. D.

[40] *See* Mot. Hr'g Tr. 73 ("[W]hich is a sign that he's been driving very hard through the night").

[41] *See* Mot. H'rg Ex. 1B at 00:13:43-00:15:35.

[42] *See Callison*, 2 F.4th at 1132-33 (listing some similar factors and finding reasonable suspicion); *United States v. Lyon*, 486 F.3d 367, 372 (8th Cir. 2007) (finding reasonable suspicion from an unusual travel itinerary, contradictory descriptions of places visited, and a large amount of luggage for the trip).

Rutledge next claims that the officers' search for drugs, under the automobile exception, did not extend to a locked safe within the van.[43] He contends that officers violated the Fourth Amendment when they opened his safe without obtaining a warrant.[44] Controlling case law though does not back up this position.[45]

The automobile exception permits a warrantless search of a vehicle, and containers inside it, if officers have probable cause to believe that the vehicle contains contraband.[46] Probable cause may be developed via a drug dog alert; "[a]ssuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present."[47] The scope of the automobile exception search is not "defined by the nature of the container in which the contraband is secreted," but by "the object of the search and the places in which there is probable cause to believe that it may be found."[48]

---

[43] Docket No. 30 at 8-9.

[44] *Id.*; *see also* U.S. CONST amend. IV (protecting the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure").

[45] *See generally California v. Acevedo*, 500 U.S. 565 (1991); *United States v. Ross*, 456 U.S. 798 (1982).

[46] *Ross*, 456 U.S. at 824; *see also Acevedo*, 500 U.S. at 580 ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.").

[47] *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007).

[48] *Ross*, 456 U.S. at 824.

Here, the Task Force officers were investigating Rutledge, who they thought was bringing in methamphetamine from Colorado to South Dakota. Tracking a phone associated with Rutledge as it moved out of Colorado using a PRTT warrant, officers lawfully pulled over his van using a lawful pretextual stop. Lord found Rutledge to be the driver.

Then, based on Demi's alert and the suspicious conduct of the occupants, officers developed probable cause to believe the van contained drugs. Rutledge does not challenge Demi's reliability, nor does he posit that Anderson deployed her in a leading and suggestive manner or mistook her alert for something else. After officers developed probable cause, their search of the van garnered methamphetamine, marijuana, various pieces of drug paraphernalia, and a safe.[49] Because additional drugs could be concealed in the safe, the safe was well within the scope of the search.[50] Opening the safe, whether it be by key or crowbar,[51] did not violate Rutledge's Fourth Amendment rights.[52]

---

[49] *See* Mot. Hr'g Tr. 75.

[50] *See Ross*, 456 U.S. at 824.

[51] *See Acevedo*, 500 U.S. at 576 ("If destroying the interior of an automobile is not unreasonable, we cannot conclude that looking inside a closed container is.").

[52] *Wyoming v Houghton*, 526 U.S. 295, 307 (1999); *see also United States v. Farlee, 427* F. Supp. 3d 1123, 1129 (D.S.D. 2019) (citing *Houghton* and holding that "probable cause extended to the safe because it could have concealed drugs, the object of the officers' search").

**D. The Interview**

Rutledge's final claim is that the *Miranda* warning given before his interview was not enough to cleanse the taint of the illegal stop, search and arrest, and thus his statements to D'Acunto must be suppressed.[53] But because the initial stop and search were in accord with Fourth Amendment precepts, there is no poisonous tree from which tainted fruit might sprout. Absent that, D'Acunto Mirandized Rutledge,[54] and his subsequent waiver[55] was a knowing, voluntary, and intelligent one.[56] So Rutledge's statements, during the interview, are fully admissible.

**CONCLUSION**

Because Rutledge committed a traffic violation, that Dowling witnessed and advised other officers of, there was probable cause to stop Rutledge's van. And because Lord developed reasonable suspicion during the stop, any extension of it (before Demi's alert), was justified. Officers likewise did not exceed the scope of their search of the van and safe found in it and they provided Rutledge with *Miranda* warnings before

---

[53] Docket No. 30 at 9-10.

[54] *See* Mot. H'rg Ex. 2A at 00:06:30-00:07:04.

[55] *See* Mot. H'rg Ex. 2A at 00:07:13.

[56] *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966) ("[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowing[,] and intelligently").

questioning him, which he validly waived. Thus, none of the evidence obtained after the stop is subject to the jaws of the exclusionary rule and should be suppressed.

**RECOMMENDATION**

In accordance with the authorities and legal analysis set forth in this report, and the record now before the Court, it is

RECOMMENDED that Rutledge's Motion to Suppress Evidence[57] be denied.

**NOTICE**

The parties have 14 calendar days after service of this report and recommendation to file their objections to the same.[58] Unless an extension of time for cause is later obtained,[59] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[60] Objections must "identify[] those issues on which further review is desired[.]"[61]

---

[57] *See* Docket No. 24.

[58] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[59] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[60] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[61] *Arn*, 474 U.S. at 155.

Dated this 24th day of September, 2021, at Pierre, South Dakota.

**BY THE COURT:**

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**