UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| UNITED STATES OF AMERICA, Plaintiff, vs. JAMES RUTLEDGE, Defendant. | 3:20-CR-30144-RAL<br><br>OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS |
|---|---|

Defendant James Rutledge was stopped by police officers while driving in rural South Dakota early one summer morning. A search of his vehicle turned up methamphetamine, marijuana, and a handgun. Rutledge's chief argument is that the evidence seized from his vehicle must be suppressed because the officers lacked probable cause for the traffic stop. This Court denies Rutledge's motion to suppress because the traffic stop complied with the Fourth Amendment.

I.  **Facts**

Officers with the Northern Plains Safe Trails Drug Enforcement Task Force (Task Force) received information about Rutledge in the Summer of 2020 when investigating methamphetamine distribution in central South Dakota. T. 13–14, 57–58, 88, 104–05, 112–21. Intelligence from an informant and a local drug dealer's phone made officers suspect that Rutledge was using rental vehicles to transport methamphetamine from Colorado to Winner, South Dakota. T. 14–15, 120–21, 133; see also Def.'s Ex. G. Alexa D'Acunto, an agent with the South Dakota Division of

1

Criminal Investigation, obtained a pen register trap and trace warrant for phone numbers associated with Rutledge. T. 105; Def.'s Ex. G. Among other things, the warrant enabled officers to track the location of the cellular device assigned to Rutledge's phone number. T. 105–08; Def's Ex. G at 12–15, 19–23; Def.'s Ex. A.

On August 26, 2020, Rutledge's number was transferred from a phone in South Dakota to a phone in central Colorado. T. 107, 121–22; Def.'s Ex. A. Data from the phone in Colorado showed that Rutledge's number continued to communicate with a suspected drug dealer in the Winner area. T. 122–23. On the evening of August 27, 2020, the phone in Colorado began traveling towards South Dakota. T. 107, 123; Def.'s Ex. A. Agent D'Acunto and other Task Force officers, including Trooper Dylan Dowling and Sergeant John Lord with the South Dakota Highway Patrol, planned an interdiction stop of the vehicle carrying the phone. T. 15, 57–59, 107–08. Not knowing who was driving the vehicle or what the vehicle looked like, Agent D'Acunto told the officers to stop the vehicle carrying the phone once they developed probable cause to do so. T. 108, 123–25; Def.'s Ex. A.

Cell location information showed that the vehicle was traveling north on U.S. Highway 183 towards Colome, South Dakota. T. 16, 59; Def.'s Ex. A. Trooper Dowling and BIA Agent Derek Parish waited in Colome in an unmarked police car parked near the intersection of U.S. Highways 183 and 18. T. 16–19; Gov.'s Ex. 3. Highway 18 intersects with Highway 183 at an angle, with Highway 183 running north-south and Highway 18 running southeast to northwest.[1] Gov.'s Ex. 3.[2] A vehicle traveling north on Highway 183 towards the intersection would encounter

---

[1] This is a peculiar intersection with Highway 18 turning into Highway 183 after the intersection while Highway 183 turns into Highway 49 after the intersection. Gov. Ex. 3. Highway 49 then runs north while Highway 183 runs northwest. Gov. Ex. 3.
[2] Government Exhibit 3, which is a picture of the intersection, is included at the end of this opinion to aid the reader in understanding the intersection's layout.

2

two stop signs, one on each side of the road. Gov.'s Ex. 3; T. 20–21. These stop signs are offset because of the angle at which Highway 18 intersects with Highway 183. Gov.'s Ex. 3; see also T. 20–21. The signs are approximately 120 feet apart, and a vehicle driving north on Highway 183 towards the intersection would encounter the stop sign on the right side of the road first. Gov.'s Exs. 15–19; Doc. 50 at 2; see also T. 35. Trooper Dowling and Agent Parish could see both stop signs from their secluded position. T. 19–20, 24. However, the layout of the intersection and the presence of farm equipment and a grain elevator made it difficult to see whether a vehicle that reached the intersection went north on Highway 49 or northwest on Highway 183. T. 25, 39–40; Gov.'s Ex. 3.

At approximately 4:50 a.m. on August 28, Trooper Dowling saw a white van traveling north on Highway 183 towards the intersection. T. 23, 26, 34; Def.'s Exs. A, C. The van made a complete stop at the first stop sign, but rolled through the second stop sign. T. 24, 32, 37, 46, 48. Trooper Dowling informed Sergeant Lord and other Task Force members that the van failed to come to a complete stop at the stop sign and then headed west. T. 26, 40, 63, 82.

Sergeant Lord, who was driving south on Highway 49, passed a white van a few miles north of the intersection. T. 63–64. When another officer communicated shortly thereafter that he could not locate a vehicle west of the intersection, Sergeant Lord turned around and pulled the van over. T. 63–64. There were no other vehicles in the area.

Sergeant Lord approached the van, observed a red mini torch in the center console, and informed Rutledge, who was driving the van, that he had been stopped for failing to stop at a stop sign in Colome. Gov.'s Ex. 1A at 06:13–06:30; T. 67. Upon Sergeant Lord's request, Rutledge provided his driver's license, and the passenger produced the vehicle insurance and rental car agreement. T. 66. According to Sergeant Lord, Rutledge and the passenger appeared scared and

3

nervous. T. 65. Rutledge exited the van and Sergeant Lord performed a quick pat down before he and Rutledge sat down in the patrol car. Gov.'s Ex. 1A at 07:15–07:33.

In the patrol car, Sergeant Lord began writing a warning ticket for Rutledge. Gov.'s Ex. 1B. He asked Rutledge where he was coming from, and Rutledge replied, "It doesn't matter, just personal issues." Gov.'s Ex. 1B. at 07:55–08:02. Rutledge and Sergeant Lord talked briefly while Sergeant Lord worked on his computer. Gov.'s Ex. 1B at 08:05–10:00. Sergeant Lord then said that more than one address came back for Rutledge's license, and Rutledge explained that he was "kind of transitory right now" but provided a Boulder, Colorado mailing address. Gov.'s Ex. 1B at 10:00–10:50. Sergeant Lord updated Rutledge's address and continued to work on the ticket. T. 68–69, 96; Gov.'s Ex. 1B at 10:50–13:40. In the meantime, another officer arrived with his drug dog.

Just under ten minutes into the stop and eight minutes after Rutledge entered the patrol car, the other officer deployed his drug dog around Rutledge's van. Gov.'s Ex. 1A at 15:30. The dog alerted to the presence of drugs in the van within twenty seconds of being deployed. Gov.'s Ex. 1A at 15:30–15:50; T. 72. Officers searched the van and found loose methamphetamine, a marijuana vape pen, two partial marijuana cigars, marijuana products from a dispensary in Colorado, two scales with methamphetamine residue on them, and a safe. T. 75; Def.'s Ex. B. The safe was locked, but the officer who took Rutledge to jail found the key in Rutledge's wallet and returned to the scene to open it. T. 76; Def.'s Ex. B. Inside, officers found a handgun and approximately 200 grams of methamphetamine. T. 76–77; Def.'s Ex. B.

Agent D'Acunto interviewed Rutledge at the Winner jail on the evening of August 28. T. 109. Rutledge waived his Miranda[3] rights and made some incriminating statements. T. 134; Gov.'s Ex. 2A.

A federal grand jury eventually indicted Rutledge for conspiring to distribute methamphetamine, possessing methamphetamine with the intent to distribute it, and possessing a firearm while being an unlawful user of a controlled substance. Doc. 1. Magistrate Judge Mark A. Moreno held a hearing on Rutledge's motion to suppress, during which he heard testimony from Trooper Dowling, Sergeant Lord, and Agent D'Acunto. He also received several exhibits into evidence, including videos of the traffic stop and photos and videos of the intersection in Colome. Judge Moreno recommended denying Rutledge's motion to suppress, concluding that probable cause supported the traffic stop, that Sergeant Lord did not prolong the stop and that reasonable suspicion to do so existed even if he did, that the search of the safe was lawful, and that Rutledge's statements during the interview need not be suppressed as fruit of the poisonous tree. Doc. 58. Rutledge has now objected to the report and recommendation.[4] Doc. 63.

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." However, "[i]n the absence of an objection, the

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).
[4]Rutledge also filed a pro se objection to the report and recommendation. Doc. 60. Although this Court understands Rutledge's desire to protect his rights, he is represented by very capable counsel. This Court thus declines to consider his pro se objections. See United States v. Tollefson, 853 F.3d 481, 485 (8th Cir. 2017) ("A district court is not required to entertain pro se motions filed by a represented party." (cleaned up and citation omitted)); United States v. Blum, 65 F.3d 1436, 1443 n.2 (8th Cir. 1995) ("Generally it is Eighth Circuit policy to refuse to consider pro se filings when a party is represented by counsel.").

5

district court is not required 'to give any more consideration to the magistrate's report than the court considers appropriate.'" United States v. Murillo-Figueroa, 862 F. Supp. 2d 863, 866 (N.D. Iowa 2012) (quoting Thomas v. Arn, 474 U.S. 140, 150 (1985)). Having conducted a de novo review of those portions of the report and recommendation to which Rutledge objects, this Court adopts the report and recommendation.

## II. Traffic Stop

A traffic stop is a "seizure" under the Fourth Amendment and must be supported by probable cause or reasonable suspicion. United States v. Gordon, 741 F.3d 872, 876 (8th Cir. 2013). Probable cause for a traffic stop exists "[a]s long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law." Id. (cleaned up) (quoting United States v. Coney, 456 F.3d 850, 856 (8th Cir. 2006)). This is true even when the traffic violation is minor, and the stop is simply "a pretext for other investigation." United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008); see also Whren v. United States, 517 U.S. 806, 813 (1996) (explaining that Supreme Court precedent "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"). The less-rigorous standard of reasonable suspicion "exists when an 'officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" Gordon, 741 F.3d at 876 (internal marks omitted) (quoting United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012)). The Fourth Amendment requires that police officers be reasonable, not perfect. Heien v. North Carolina, 574 U.S. 54, 60–61 (2014). Thus, grounds for a traffic stop may rest on an officer's mistake of fact or law, provided that the mistake is objectively reasonable. Id. at 60–67; Hollins, 685 F.3d at 706.

Judge Moreno found that there is not a clear view of traffic approaching from the northwest at the first stop sign, and that Rutledge's failure to come to a complete stop at the second stop sign provided probable cause for the traffic stop. Doc. 58 at 7. The determinative question here is not whether Rutledge violated South Dakota law, but rather whether Trooper Dowling's conclusion that he did was objectively reasonable. United States v. Cox, 992 F.3d 706, 709 (8th Cir. 2021).

This Court agrees with Judge Moreno that the traffic stop complied with the Fourth Amendment. South Dakota law requires that:

> every driver of a vehicle approaching a stop intersection indicated by a stop sign shall come to a full stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection, or if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection.

SDCL § 32-29-2.1. The intersection here did not have a clearly marked stop line or crosswalk. See Gov.'s Exs. 8, 10, 12–14; Def.'s Ex. L; see also Doc. 63 at 2 (Rutledge's brief stating that there "was no crosswalk line at this intersection"). Thus, South Dakota law required Rutledge to come to a full stop "at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection." SDCL § 32-29-2.1. As Judge Moreno found and the videos of the intersection the parties submitted show, a driver stopped at the first stop sign would have a very limited view of traffic approaching the intersection from the northwest. Gov.'s Ex. 8 at 00:47–1:30; Def.'s Ex. L at 00:20–00:45. Under these circumstances, it was objectively reasonable for Trooper Dowling to conclude that Rutledge violated SDCL § 32-29-2.1. See Cox, 992 F.3d at 709; United States v. Hastings, 685 F.3d 724, 727 (8th Cir. 2012) (holding that the court need not determine whether the defendant violated a traffic statute "because it was objectively reasonable for" the detective to conclude that the defendant did).

7

Rutledge objects to Judge Moreno's reliance on the Government's video to find that there is not a clear view of traffic approaching from the northwest at the first stop sign. He argues that the only thing that blocks the view to the northwest in the video is a camper, and that the camper may not have been there when he was stopped. Doc. 63 at 3. Having viewed the videos submitted by the parties multiple times, this Court finds that even if the camper was not present on August 28, 2020, Trooper Dowling would still have had an objectively reasonable basis for concluding that Rutledge did not have a view of traffic approaching from the northwest when he stopped at the first stop sign.

Rutledge also objects to Judge Moreno's finding that Sergeant Lord could stop him under the collective knowledge doctrine. Rutledge seems to contend that because Trooper Dowling made a mistake about the direction the van went after the intersection, Sergeant Lord should not have relied on Trooper Dowling's statement that Rutledge failed to come to a complete stop at the stop sign. The collective knowledge doctrine applies to cases like this one, where multiple officers are working as a team and communicating with one another. United States v. Frasher, 632 F.3d 450, 453 (8th Cir. 2011). The question under the doctrine is whether the team of officers as a whole possesses probable cause for the traffic stop. United States v. Robinson, 664 F.3d 701, 703–04 (8th Cir. 2011) (upholding a traffic stop under the collective knowledge doctrine where the officer who initiated the stop did not know the factual basis for the stop). Trooper Dowling had an objectively reasonable basis for concluding that Rutledge violated South Dakota law, and he communicated that information to Sergeant Lord. Since the officers had an objectively reasonable basis for concluding that the van's driver violated the law, Trooper Dowling's mistake about the van's direction of travel is irrelevant. See United States v. Howard, 883 F.3d 703, 707 (7th Cir. 2018) (explaining that an arrest is proper under the collective knowledge doctrine "so long as the

8

knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause" (citation omitted)). Regardless, Sergeant Lord's decision to stop the van was reasonable even though he knew Trooper Dowling was wrong about the direction the van took. As Judge Moreno explained, when Sergeant Lord stopped Rutledge, "no other vehicles, much less other white vans, had passed through the intersection from the south in the preceding hours." Doc. 58 at 8. Moreover, Trooper Dowling's mistake about the direction the van travelled was not the sort of statement that would have made a reasonable officer doubt Trooper Dowling's credibility. The initial stop was constitutional and Rutledge's objections to the contrary are overruled.

### III. Extension of Traffic Stop

Rutledge argues that Trooper Lord unreasonably extended the stop so that the drug dog could sniff Rutledge's van. A traffic stop should only last long enough to complete the purpose of the stop. Rodriguez v. United States, 575 U.S. 348, 354 (2015). Although the primary purpose of a traffic stop is to "address the traffic violation that warranted the stop," officers may also conduct "incident[al]" inquiries such as running a warrant check on the driver and inspecting the driver's license, registration, and proof of insurance. Id. at 354–55. Absent reasonable suspicion that other criminal activity is afoot, an officer's authority for conducting a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. at 354. But when an officer "discovers information leading to reasonable suspicion of an unrelated crime," he "may extend the stop and broaden the investigation." United State v. Woods, 829 F.3d 675, 679 (8th Cir. 2016).

Rutledge does not make any specific objections to Judge Moreno's recommendation that Sergeant Lord did not unlawfully expand the traffic stop. Instead, he relies on his earlier brief and

the video of the stop. Doc. 63 at 3. Judge Moreno adequately addressed Rutledge's arguments in the report and recommendation, and there is no need to repeat that analysis here. This Court agrees with Judge Moreno that Sergeant Lord did not lengthen the stop beyond what was reasonably necessary to complete the ticketing process. See Doc. 58 at 10–11 (explaining why the traffic stop was not unreasonably delayed); T. at 96 (Sergeant Lord explaining the length of the warning ticket process); see also United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007) (stating that "there is no *per se* time limit on all traffic stops" and that if complications arise in completing the purpose of the stop "police may reasonably detain a driver for a longer duration than when a stop is strictly routine").

Regardless, Sergeant Lord had reasonable suspicion to extend the stop for the dog sniff. Courts evaluating whether reasonable suspicion exists consider the "totality of the circumstances" to determine whether the officer "has a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (cleaned up and citation omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. (cleaned up and citation omitted). Sergeant Lord has been a highway patrol officer for twenty-one years and has received training on drug interdiction. T. 51–56. He knew about Agent D'Acunto's investigation of Rutledge, including Rutledge's frequent use of rental vehicles. T. 57–58, 88, 93; Def.'s Ex. B. On August 27, 2020, Agent D'Acunto told Sergeant Lord that she had information suggesting that Rutledge was driving methamphetamine from Colorado to South Dakota. T. 57–58, Def.'s Ex. B. When Sergeant Lord stopped the white van, he saw a mini torch—an item he typically associates with methamphetamine use—in the center console and learned that the van was, in fact, a rental vehicle. T. 55, 66–67. The behavior

of Rutledge and his passenger further heightened Sergeant Lord's suspicion. T. 73. Both Rutledge and the passenger appeared scared and nervous, T. 65, and Rutledge refused to answer Sergeant Lord's question about where he was coming from, T. 67. In Sergeant Lord's experience with the South Dakota Highway Patrol, passengers do not typically appear nervous unless they are involved in criminal activity, T.66, and most people "readily" answer questions about where they are coming from, T. 67. Moreover, Rutledge's demeanor changed from tired and nodding off to being very alert when Sergeant Lord mentioned that a drug dog would be deployed. T. 73; Gov.'s Ex. 1B at 07:55–14:15. The information Sergeant Lord had from Agent D'Acunto and the observations he made during the stop added up to reasonable suspicion of drug activity. The traffic stop was thus not unreasonable even if Sergeant Lord did briefly extend the stop to facilitate a dog sniff.

## IV. Search of Safe

Rutledge argues that the officers needed a warrant to search the locked safe in his car. This argument fails for the reasons explained by Judge Moreno. An officer with probable cause to search a vehicle may search any item within that vehicle that can contain the object of the search, regardless of whether the item belongs to the driver, passenger, or someone else. Wyoming v. Houghton, 526 U.S. 295, 307 (1999). Here, the drug dog alerted to the van and the officers found methamphetamine and marijuana inside. The officers obviously had probable cause to believe that the van contained illegal drugs, and this probable cause extended to the safe because it could have held additional drugs, the object of the officers' search. United States v. Farlee, 427 F. Supp. 3d 1123, 1129 (D.S.D. 2019) (holding that a drug dog's alert to a truck and information officers possessed about the truck's driver being a methamphetamine user provided probable cause to search a locked safe found in the truck). It does not matter that the safe was locked or that Rutledge

had already been arrested and taken to jail when officers searched the safe. See United States v. Johns, 469 U.S. 478, 480 (1985) (upholding a "warrantless search of packages several days after they were removed from vehicles that police officers had probable cause to believe contained contraband") see also id. at 484–85 (explaining that there "is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure" and rejecting the idea that "searches of containers discovered in the course of a vehicle search are subject to temporal restrictions not applicable to the vehicle search itself"); Carter v. Parris, 910 F.3d 835, 840 (6th Cir. 2018) (explaining that it "makes no difference" that a container found in a car was locked where the officers had probable cause to believe that the container contained additional drugs).

### V.  Interview

Rutledge argued unsuccessfully to Judge Moreno that his interview must be suppressed as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963). He now objects to Judge Moreno's recommendation to the contrary. Because the stop and search of the vehicle were legal, Rutledge's objection is overruled.

### VI.  Conclusion

For the reasons explained above, it is hereby

ORDERED that Rutledge's Motion to Suppress, Doc. 29, is denied. It is further

ORDERED that the Report and Recommendation, Doc. 58, is adopted.

DATED this 30th day of November, 2021.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE